Madam Clerk, please call the first case. Good morning. Counsel, you may proceed. Good morning, Your Honor. My name is Jim Kenney. Excuse me. I represent David Pera in this appeal to this court. Mr. Pera had been injured on April 26, 2006, when a load of balconies fell on top of his head. He had been working as a truck driver, transporting these prefabricated steel balconies on a truck. He brought them to a location downtown. When it was too windy to unload those balconies, he was required to return back to his home base in Oak Forest. When he returned to the truck yard, he was required to unstrap the load so that the crane people could maneuver a crane to uplift these materials off of the truck. Well, nobody disputed he had an accident. No, sir. The issue turns on whether or not, by March 31, 2007, his condition had returned to its pre-April 26 level, correct? That's true. You've got Dr. Kohs and Schenkel pining that the defendant's condition had returned to those levels, right? They stated that in their reports. Okay. And was the claimant's treating physician somewhat equivocal on the question of the causal relationship as well? No, not at all. Dr. Sweeney had testified that there was a degenerative change that had been present at the C-5, C-6 level, and that the force of the impact to the top of the head, driving Mr. Parrot backwards to the ground, could have aggravated that pre-existing condition. Let me ask you this. Did he say with any degree of medical certainty that the claimant's need for treatment was a result of the accidents or the degenerative nature of his condition? What did he specifically say? He said that it was related to, it was aggravated by the accident. The pre-existing condition was aggravated by that particular injury. As a matter of fact, Your Honor, it's a great point that you bring up because prior to the April 26 accident, an MRI had been done approximately four or five years earlier that just simply showed degenerative changes. But later MRIs demonstrated the existence of compression fractures at the C-5, C-6 level. So it's my position that that materially altered the composition and the integrity of the spine. You know, maybe I think Justice Hudson was trying to get at, what is the real issue here? Medical care. Future, correct? There was some medical care that had been received after Mr. Parrot's return to work for a different employer in April 2007. At that point in time, the respondent disallowed and refused to provide any additional medical care at that point in time. Okay, so what we were looking for when I submitted into evidence were billing statements for treatment that Mr. Parrot had had from Dr. Sweeney, Dr. Salehi, Dr. Piska for mostly palliative care. After March. After March of 2007. Right. Okay, so that care after. But Dr. Sweeney does give an opinion, doesn't he, that the need for ongoing treatment, he couldn't say whether that was causally related to the accident or merely the result of the degenerative nature of his condition. He couldn't say that it was solely responsible, but in other parts of his testimony, he absolutely stated that Mr. Parrot's need for further medical care was as a direct result of the April 26th accident. And again, I point to the fact that we have a material change in the integrity of this man's spine. Can I ask another question? Didn't Sweeney indicate that the claimant's surgical complaints did not appear until over a month after the accident and cervical pain should have happened within a few days after the accident? And that he didn't report the pain until a month after, suggesting to him that the accident may not have been a causative factor? Dr. Sweeney did make mention of the fact that the first reference of cervical spine pain, as it was related to Dr. Freeman, who was Sweeney's partner, did occur sometime in the middle part of May of 2006, approximately five or six weeks after this accident. But the point is that at the time that Mr. Parrot had been injured, and you have to understand the totality, when Parrot was knocked to the ground and had hundreds of pounds of metal on top of him, from which he had to be extricated from this mess by EMTs from Oak Forest, he had fractures of his ribs, he had compression fractures in his cervical and lumbar spine, he had a scalp avulsion, he was complaining of some headaches. I think that whether or not he could absolutely isolate that he was having neck problems at that point in time is part and parcel of the nature and the severity of the original work injury. What did Shanker say? Shanker thought he was fainting or something, didn't he? Well, it's interesting because in the 29 pages of Dr. Shanker's report, he devotes three paragraphs, three paragraphs, for prior analysis of Mr. Parrot's cervical spine complaints. And then the whole reason why Parrot went to see Shanker in the first place was we were looking to have an EMG done. Shanker was supposed to provide an examination to determine whether or not he thought an EMG would be relevant in this case. So Shanker looks at hundreds of pages of medical records, devotes three paragraphs of his 29-page report to prior medical conditions. I suppose what I'm saying is really a rather simple thing. Shanker opines that there's no causal relationship between his current condition and his accident. Sweeney arguably says there is. Slay indicates that he would have had to have this treatment even if no accident occurred because of his prior condition. So why is the decision of the commission against the manifest way to the evidence, why couldn't they believe Shanker? Two reasons. Twice over clean and CISPRO. Well, CISPRO and twice over clean both say that the question of whether there is a causal relationship between the current condition of ill-being and a prior degenerative condition is a matter of fact for the commission to decide. That's true. And they decided against your client. But the commission can't ignore relevant facts. If this court wants to examine further the... CISPRO and twice over clean were bright line tests. If you had a prior condition and there was any evidence in the record that the current condition would have occurred even absent the accident, then it's a matter of law. Virtually, we said, and twice over clean and CISPRO, there was no recovery. The Supreme Court said that's not true. It's a question of fact, and if there's evidence in the record that suggests that this was a cause, then there's recovery. But the question is a question of fact to be decided by the commission. In this case, they decided it wasn't. They decided, well... Soft tissue contusion, and that's what Schenker decided. Neither the May 8, 2006 visit to St. James Hospital nor physical therapy on August 1 were causally related to the accident. So there was no causal connection there. Judge, when... With regard to the commission decision, the commission actually found that he suffered integral injuries to his spine. Okay? We know for a fact that the commission, in its conclusion, found that he suffered a compression fracture of L3, suffered a compression fraction at C5 and C6. We also know that this was a case, because we brought in under 19B, seeking medical benefits pursuant to Section 8A, we were required to prove every single element of the case. The respondent disputed every single element of this case. They disputed accident, causal connection. But in a simple way of looking at it, yes, the fractures occurred. But isn't the fractures... The view is they have resolved and the present condition of ill-being is not related to... That's the whole issue in the case. What happened before that is not the issue. It's whether or not his physical condition had returned to the pre-ABLE-II-6000 level. Correct? Isn't that really what we're talking about? Yes. So why are we talking about everything that happened before that? Because that's what the commission talked about in analyzing the report of Dr. Schenker, who brought in all the pre-existing conditions. And so the simple language from choice over clean is when the employee with a pre-existing condition is injured in the course of his employment, serious questions are raised about the genesis of the injury and the resulting disability. And what I'm pointing to is that the need for further medical care. And the commission in its decision says that the man's current need for medical care is not related to the accident. Right, it's resolved. Well, they didn't say it was resolved. They never said that. They didn't tie in that particular link, that nexus. Isn't there some medical evidence that when that diagnosis of fractures was made, that he was told that they're going to resolve? I would tend to agree that that would be the case. Okay. Well, I think then it does get back to the issue that my fellow justices are talking about. We're at the point now, going forward, is that it will be a consequence of the incident, or is it a return to the normal degenerative process that this gentleman would be undergoing absent the incident? Dr. Salehi was in the absolute best position to analyze Mr. Parra's condition. Salehi had rendered medical care to Parra in 2003 and 2004, did a fusion, I believe, in 2005. Salehi testified that whatever was going on with this man's condition in his cervical spine was related to aggravated by the accident of April of 2006. Wait a minute. Is that really a fair characterization? Didn't Salehi opine the claimant's current need for treatment was possibly attributable to the degenerative nature of the condition, and that he might have been in the same need of treatment even if no accidents had occurred? He didn't say that? Circumstantially, Your Honor. Is that a complete endorsement of your position? Certainly. Well, that is based on the particular question that was asked by counsel at that point in time. Is it possible? Sure, it's possible that that could have happened. Okay? But when he was asked to give an opinion within a reasonable degree of medical and surgical certainty, he linked it up to the April 2006 accident. And I thought you were going to ask me a question. Go ahead. But with regard to Salehi, Salehi suggested let's look at this from a conservative nature, see whether or not we can resolve the condition through therapy, perhaps some injections, and move forward. That's what the parents were looking for. Aren't we overlooking something else, the 500-pound elephant in the room? Didn't the arbitrator and the commission adopt the findings? They didn't find the claimant credible. I'm sorry. Maybe they want to get into that. Actually, I'm glad that you brought it up because I was kind of wondering how it would bring this into our discussion. That's the big thing to talk about. Okay. Counsel had brought in evidence of prior work injuries. My client had the misfortune of suffering a fractured ankle for an accident that happened back in the 90s. Okay? He had a mishap where he suffered an injury to his lumbar spine which required a discectomy. That occurred in approximately 1997. He had another accident in 2001. Okay? There's a 2001 accident that had some discussion with regard to the cervical spine, but the primary problem with the 2003 accident or the 2001 accident was the lumbar spine which ended up being fused at L4-L5. Here's what I want to hone in on. I think this is the particular part of the claimant's testimony that's troubling. He testified, did he not? Your client testified he was not under any work restrictions prior to the April accident. And then I cross-examined and said he was possibly under restrictions at that time. And clearly the evidence was he'd been in permanent restrictions prior to April 2006. And then on March 31st, 2007, he was able to resume work under the same restrictions. Aren't those the facts? Those are facts. Those are facts. Can't you see why they would find his credibility to be diminished? He doesn't know if he's under restrictions or not? Judge, one of the problems that I had with this was when the evidence of the prior injuries was put in, it wasn't put in to show what the substantive condition of this man's physical being was. It was to show how much money he got in his work comp cases. And then arbitrator Hagen creates this description that here's a man who's familiar with the system. Okay, well insurance companies are familiar with the system too. Okay? Let's be fair. The credibility, the arbitrator concludes that the petitioner is not a credible witness. He lied by omission and commission when he completed his employment application in medical history forms as to his prior ability to work, the forms of the respondent, lied about his permanent restrictions, lied about his ability to perform physical duties required by the respondent's job, and lied about permanent restrictions when he got his job. The arbitrator thought he was a liar. So did the commission because they affirmed and adopted the decision. They just didn't believe it. And that becomes, I think, especially critical when Salehi says this guy's magnifying his symptoms. This guy's a symptom magnifier. Salehi or Schenker? Schenker, pardon me. Schenker turns around and says this guy's magnifying his symptoms. And you get down to the situation. They just happen to believe Schenker. They said so in their opinion. Further opined the petitioner was capable of returning to work in a regular duty capacity and that the petitioner's continued use of prescription narco was not causally related to the alleged work accident. And then they go on to say that in their conclusion, and it's really a rather simple conclusion, concludes that the petitioner failed to prove a causal connection between his present condition and need for prospective medical treatment and his work accident of April the 26th. And that's exactly what Schenker said, wasn't it? He did say that. Well, can I ask you a question? Was Schenker's testimony inadmissible for some reason? No. So it's weight. I didn't. It's weight, right? Yes. And weight gets decided by the commission. Okay. But when you address the issue of credibility. Counsel, you will have time on reply. You've gone. Okay. Can I just finish this one point and sit down? Okay. With regard to the issue of credibility, and if you want to talk about lying about his restrictions, yes, he didn't disclose those restrictions, but he did the job that he was required to do on a daily basis, lifting chains, throwing tarps. There was no evidence of absenteeism, any evidence of medical care. This man did not have any evidence of any medical care going back two and a half years prior to this accident. And so it wasn't like he had an ongoing condition. He's degenerative disc disease. Yeah. That's kind of ongoing, isn't it? But there's no evidence of ongoing medical care. That condition was not being addressed by any physician. And so I'm saying that he was able, he was a functioning person at some point in time. Okay. He has this accident. Counsel. You'll have time, five minutes to reply. Sorry. Counsel, you may respond. Good morning, Justices. Jim Kelly for the respondent. So from your standpoint, this is a simple case. I think I should not open my mouth, honestly. I think that the summary of the medical opinions from the questions asked is dead on. Shanker obviously says no causal connection. Sweeney, I think in order, if you take his testimony as a whole, or Salehi's testimony as a whole, I don't think they provide causation. But if you give Sweeney the benefit of the doubt, the way he gives causation is he says, if you can believe the subjective complaints of the petitioner. And I think that's why the way this discussion was ending is poignant also on the credibility standpoint. In order for Sweeney's testimony to be given weight, you have to believe that this guy was totally asymptomatic and then became symptomatic because of this. I think it's interesting to look at the cervical. There were some really apt points made about that. He has this steel fall on him, so he has an absolute full workup at the ER, and there was no diagnosis made of the cervical. There were no complaints made of the cervical. It wasn't until, excuse me, 30 days later that he even made the first complaint. And Sweeney said that 36, or excuse me, 24 to 48 hours, if this was traumatically induced, he would have had symptoms. And I think that's really important when you put that with Dr. Salehi's testimony because Dr. Salehi did say that this is a degenerative condition, and he doesn't even call these compression fractures. If you look at his testimony, you look at his records, he calls them compression deformities. And when counsel said he's in the best position to look at this, he truly is because there's preexisting MRIs and preexisting X-rays that show these compression deformities even before this accident. There was some testimony that there may have been some advancement, so you could give him the benefit of the doubt on that. But Dr. Salehi says that that would have been the natural progression from the five years before when he had the first MRI to when he saw him later. So at best you have conflicting medical evidence, and the commission didn't believe the claim. So is that against the manifesto that we have? No, it is not. And I think that with regard to the L4 fracture, Salehi comes right out and says it was healed. So now we have a guy that went back to work in April of 2007, and he's working at a very strenuous job. And it's interesting, when he goes on June 4th for a medical appointment, he has totally new cervical, it says debilitating pain in the cervical spine. He has spasms. He has things that he didn't have before. So while there's never really any testimony about an intervening event, I think you have to keep in mind that this guy had been totally disabled before he came to work for us. He'd only worked for us for a very short period of time. And before that, the five years prior to our work accident, he hadn't even been working. So I think that the testimony is that this would have waxed and waned, and he would have continued to have symptoms. And the most, I think, critical thing is the treatment that's being recommended. The treatment that he had recommended before he had our work accident, before he ever came to work for us, that was injections and the treatment. And as of the date of arbitration, he hadn't even been getting any treatment. You know, we arbitrated this in 2009. So from the time he went back to work all the way up to 2009, PISCO had given a prescription for him to come in and get some therapy, and he wasn't even attending that. I think it was two out of some sessions. So at the end of the day, there's clearly a basis in the record. It's not often that I spend almost my entire brief citing the treating doctor's testimony, but I think even if you disregard that and rely on Schenker, there's clearly a basis in the record that this decision is not against a manifest way of evidence. Thank you, Counselor. Thank you. Counselor, you may reply. Thank you. To touch base again on this credibility issue, as I was stating before, there was no evidence in the record of this man having any inability to do his job. I mean, the job that he did was pretty strenuous. Introduced into the record was the requirements. All that aside, the case boils down to, yes, he was asymptomatic until his incident. Is that correct? It's true. Okay. But we have this overarching condition of degenerative disease, and I think that was true, and I don't know what your argument about that. But your argument is that somehow this accelerated, affected that degenerative process. Is that correct? It sure did. And he's suffering from the consequence of that. It is. It is my position. And so the credibility issue only comes in in regard to Schenker's observation and notation, or opinion rather would be the best way to put it, that he is a symptom magnifier and that the symptoms are in existence or are not that severe, but that they really go with the general degenerative process. I mean, is that kind of the way the Commission looked at it, and then they sided with those opinions of the treaters? Well, see, I look at whatever happened after he returned to work for his new employer in April of 2007 as being kind of the line of demarcation that the Commission itself had drawn, because all the medical care up to that point in time was approved and found to be reasonably causally related and reasonable in nature and cost. So what happens after that? He returns to work for a different employer. There's no change in symptoms, nothing. Counsel brings up this June 4, 2007 visit with Dr. Freeman. What Freeman said is that he continues to have spasm in his neck. He's developed new spasm in his neck. This is an ongoing condition. It's an ongoing condition going back to April of 2006. And so that's my point, is that if we have a continuity and there's no intervening accident to break that chain, then the Commission's decision is erroneous as a matter of law. The Commission found every element of this case to be compensable. Accident, did it arise out of in the course of his employment? Were his injuries causally related? Was he entitled to temporary total disability benefits from April of 2006 all the way to April 1, 2007 when he returned to work for a different employer? If the Commission makes those decisions based upon the evidence that's in the record and then there's no subsequent intervening accident, I think the Commission's decision is flawed, and I think that my client was prejudiced by bringing in the evidence of the prior work injuries. I mean, Dr. Shanker didn't link up anything with regard to the 2006 condition with whatever had happened to this man back in 2001 and 2002. So for those reasons, I think that CISPR applies. I think that twice-overclean applies. I think because of that, that we're able to show that there's a continuity, there's a progression of what this man's condition was. As a result of this April accident, the Commission's decision is wrong. I mean, every chance that the Commission, everything that was of import for the Commission to decide on in terms of assessing this case, if they want to address credibility, okay, why didn't they find that some periods of time that he had medical issues were not related? I didn't say that well, so I'll say it again. What I'm getting at is that he had an accident in October of 2006, unwitnessed, okay? But the Commission decided to find that that accident, too, was causally related, okay? So I don't know how on one hand the Commission can, you know, address this whole situation and say that he has no credibility, yet certain parts of his claim depended entirely upon his ability to testify, and the Commission accepted that. So the Commission can't pick and choose when they want to address credibility, I don't think. Why not? Why not? The man testified that he had an accident on X day, and the Commission says, yeah, you did, that's truthful. Then he says, and I have all these symptoms, and the Commission says you're a symptom magnifier. You don't have those symptoms. If they said that, that would be great. I didn't see the Commission say that. I just responded to your statement that they can't pick and choose. Of course they can pick and choose. I'm sorry, but what I was getting at is that I would appreciate if there were in the record something from the Commission saying we rely on Dr. Salehi and him saying that, you know, the condition is not related. But the Commission was open-ended and said, hey, whatever's going on in his neck, we're not even going to consider that the April 26th incident might have played a role or a cause in this. And that's where the Commission is wrong. Thank you. Thank you, Counsel. Thank you, Counsel Ball, for your arguments in this matter this morning. We will be taking it under advisement.